IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JAMAL LAWSON, #326-057            *

    v.                                  * CIVIL ACTION NO. PJM-09-1705

J. PHILLIP MORGAN, et al.,         *

## MEMORANDUM OPINION

Pending is Jamal Lawson's Petition for Writ of Habeas Corpus (ECF No. 1), the State's response and exhibits (ECF No. 12), and Lawson's reply. ECF No. 15. The Court finds no need for an evidentiary hearing, *see* Rule 8(a), <u>Rules Governing Section 2254 Cases in the United States District Courts</u>; *see also* 28 U.S.C. § 2254(e)(2), and for reasons stated below, dismisses the Petition with prejudice and denies a certificate of appealability.

### Background

Lawson was charged in the Circuit Court for Washington County with fourteen separate criminal offenses stemming from a May 2, 2004, incident involving a burglary and assaults on several individuals. By the time the jury began deliberation on January 15, 2005, only six of those charges remained.[1] Relevant facts underlying the charges, as set forth by the Court of Special Appeals of Maryland in its unreported decision on direct appeal, follow:

> The evidence established by the State proved the following. At the time of the events at issue below, Kisha Wiggins and her five children resided with Wiggins' friend April Blake and Blake's two children at 220 East Avenue in Hagerstown, Maryland. Wiggins' sister, Angela Wiggins, lived less than a five minute walk away. Around 1:00 a.m. on May 2, 2004, Wiggins was walking home from a neighborhood bar. She stopped at the alley beside Angela's house to speak with Angela. The women started arguing, and began to discuss [Lawson]. Wiggins had been involved in "a sexual affair" with [Lawson], who also had been previously involved in an intimate relationship

---

[1] The remaining charges included first-degree burglary, third-degree burglary, fourth-degree burglary, second-degree assault of Kisha Wiggins, second-degree assault of April Bake, and wearing, carrying, or transporting a handgun. ECI12, Exhibit 4 at 215-17.

with Angela. [Lawson] also knew Blake, and had visited Wiggins at the house she shared with Blake. As the women were arguing in the alley, [Lawson] approached them. Angela walked away, but Wiggins remained and began arguing with [Lawson]. [Lawson] called Wiggins a "snitch" and slapped her in the face. Wiggins started crying, and [Lawson] reached into his waistband and took out a handgun, which he pointed against her stomach. When [Lawson] saw a police cruiser pull into the alley, he ran. According to Wiggins, she did not speak to the police officer, and instead continued to walk home.

Wiggins entered Blake's house through the front door and spoke briefly to Blake in the living room. Wiggins went to the kitchen, where the back door was located. The women kept this door, which was in normal condition at that time, locked. Because all of the children were asleep, Wiggins and Blake went into the upstairs bathroom to speak privately. Wiggins told Blake about her altercation with [Lawson]. They spoke for ten to fifteen minutes when they heard someone "banging on the back door." Blake left the bathroom and went downstairs to the kitchen; Wiggins stayed on the stairs. Wiggins "was scared" "[b]ecause [she] knew who it was." Before Blake got to the back door, Wiggins heard glass break and Blake screamed.

Because there was no telephone in the house and Wiggins did not have a cell phone, she ran to the second floor balcony door, opened it, and jumped down to the ground. She ran to a neighbor's house and called 911.

Anthony, Wiggins' twelve-year old son, was asleep on the living room couch when he was awoken by a "bang" from the kitchen that sounded like glass breaking. He remained in the living room, located next to the kitchen, but he saw [Lawson] "hittin'[,]" "pushin'[,]" and "punchin'" Blake "like he was mad" and he heard Blake crying. He did not see anything in [Lawson]'s hands, but he did observe [Lawson] "tryin' to hit [Blake] with [a] lamp over the head[.]" Anthony went to help Blake and "[s]macked [the lamp] out the way." Anthony helped Blake up from the floor and saw [Lawson] leave the house. Anthony also noticed glass on the kitchen floor that had not been there before.

At 12:35 a.m. on May 2, 2004, Officer Charles Coy of the Hagerstown Police Department responded to the alley near Angela Wiggins' house for "a call of a disturbance between three black females" and "a black male dragging a black female down the alley." When he arrived at the alley, he observed a white female, later identified as Wiggins, who was "being very loud" and "appeared to be intoxicated" and "kind of dirty" "like she had been on the ground[.]" Wiggins refused to talk to Officer Coy. Two other white females came out of a residence and "started dragging [Wiggins] up the alley." Also present were two black females. Coy attempted to speak to them, but they

refused and left. At no point did Coy see or look for a black male. Coy remained at the scene for a few minutes "to make sure that they weren't gonna come back to get in an argument[,]" and then left.

Around 2:00 a.m., Officer Wayne Zimmer of the Hagerstown Police Department was dispatched to 220 East Avenue for an armed burglary in progress. When he arrived, he and several other police officers, including Coy, formed a perimeter around the house. "It didn't appear that there was a problem inside the residence" at that time. A woman, later identified as Wiggins, then came up to Zimmer from a nearby house. She was "very upset" and "very animated" and was crying. "[F]rom the information" Wiggins told him, Zimmer and Coy and the other officers retrieved a ballistic shield and prepared to enter the residence.

As they were preparing to enter, Blake came out of the house. She also was crying and was "very upset." After "gathering information" from Blake, the police entered the house through the back door, but found no intruder. Wiggins, her children, and Blake's children were transported to the police station to give statements. Blake was not interviewed because she was transported by ambulance to the Washington County emergency room. Later that morning, Officer Zimmer went to the hospital to interview Blake. He saw that she was wearing a "spine collar" and was "on a backboard." Zimmer also took photos of the back door of Blake's residence, which were admitted into evidence. He did not take fingerprints of the door "because according to the statements" he had taken, [Lawson] "had been staying there off and on" and thus "[h]is prints would've been in the house either way[.]"

_____

We shall refer to Kisha Wiggins by her last name. We shall refer to Anthony Wiggins, her son, and Angela Wiggins, her sister, by their first names.

At sentencing, the State indicated that it contacted Blake to testify but that she did not want to "out of fear."

ECF No. 12, Exhibit 8 at 1-5.

The jury convicted Lawson of second-degree assault of Blake, third-degree burglary of the Wiggins residence, and fourth-degree burglary of the Wiggins residence. *Id*. At Lawson's February 22, 2005, sentencing Blake, who did not testify at trial, told the court that after visiting with Lawson at the jail, she had determined that he was not the person who assaulted her. *Id*. at 227-28. She stated that she moved to West Virginia following the crimes at

issue and was not contacted by the prosecution with respect to Lawson's court dates. *Id*. The prosecutor informed the court that both of the victims had related that they feared for their safety, and that significant attempts were made to bring Blake to testify at Lawson's trial. *Id*. at 222-23, 228-29. Lawson's trial counsel informed the court that, because Blake did not disclose her information to the defense within ten days following the verdict, he would be filing a separate motion for new trial with respect to the newly discovered evidence. *Id*. at 223-24. The court then sentenced Lawson to serve ten years incarceration for the second-degree assault of Blake, and also imposed a consecutive ten-year sentence for third-degree burglary, all suspended. The fourth- degree burglary conviction was merged for sentencing purposes. *Id*. at 232.

On February 23, 2005, Lawson filed a motion for new trial based on newly discovered evidence, which the State answered. ECF 12, Exhibit 1 at 12; *see also* Exhibits 17 & 18. The motion was denied without a hearing on March 4, 2005. *Id*. at 13. No appeal was taken from the denial of the motion for a new trial. *Id*.

On direct appeal, Lawson contended that: the trial court erred in allowing the State to introduce the 911 tape recording; the evidence was insufficient to convict him of assault; and the trial court improperly instructed the jury.[2] *Id*., Exhibit 5 at 2. On August 1, 2006, the Court of Special Appeals of Maryland affirmed Lawson's convictions in an unreported opinion.[3] *Id*., Exhibit 8. Lawson's request for certiorari review of all three grounds for appeal was denied by the Court of Appeals of Maryland on November 13, 2006. *Id*., Exhibits 9-10. As Lawson did not seek certiorari review in the United States Supreme Court, ECF No. 1 at 3, his judgment of conviction became final for direct appeal purposes on Monday, February 12, 2007.

---

[2] A fourth claim raised in Lawson's opening brief was withdrawn. *Id*., Exhibit 7.

[3] The court found that the statements contained on the 911 tape were admissible and the evidence was sufficient to sustain Lawson's conviction for assaulting Blake. The court further found Lawson's claim of instructional error unpreserved and without merit. *Id*., Exhibit 8 at 5-25.

On August 31, 2007, Lawson initiated state post-conviction proceedings in the Circuit Court for Washington County.  *Id*., Exhibits 1 and 11.  The petition, as supplemented by counsel, raised the following claims:

1. Trial counsel was ineffective for
   a. urging the jury in closing argument to find Anthony Wiggins credible;
   b. failing to investigate April Blake;
   c. failing to file a motion to suppress based on police misconduct;
   d. failing to advice him of the right to appeal the denial of a motion for new trial; and
   e. the cumulative effect of those errors;

2. Appellate counsel was ineffective for
   a. raising an incorrect argument; and
   b. failing to submit Blake's affidavit in support of his innocence claim;

3. The trial court committed misconduct by
   a. restricting the examination of Officer Zimmerer;
   b. permitting the Blake assault charge to go to the jury; and
   c. denying the motion for new trial based on newly discovered evidence without a hearing; and

4. The prosecutor committed misconduct by
   a. vouching for the veracity of a witness;
   b. failing to bring April Blake to trial; and
   c. withholding exculpatory evidence.

*Id*., Exhibits 11-14.

A hearing on the petition, at which Lawson, the trial prosecutor, and defense counsel testified, was held on February 21, 2008.  *Id*., Exhibit 13.  On April 25, 2008, the post-conviction court filed a Memorandum Opinion granting Lawson the right to be heard on his motion for new trial, but otherwise denying post-conviction relief.  *Id*., Exhibit 14 at 26-27.  Lawson's application for leave to appeal the adverse post-conviction ruling was denied by the Court of Special Appeals on May 20, 2009.[4]  *Id*., Exhibits 15-16.

---

[4] The court's mandate issued on June 19, 2009.  *Id*., Exhibit 16.

A hearing on Lawson's motion for new trial, based on newly discovered evidence from Blake, who testified, was held on September 8, 2008 and November 25, 2008. *Id.*, Exhibit 1 at 17-18 and Exhibits 17-19. In an opinion and order dated December 11, 2008, the court denied the motion, finding Blake's testimony that Lawson was her assailant not credible. *Id.*, Exhibit 20. The ruling was not appealed. *Id.*, Exhibit 1.

In his Petition for federal habeas corpus relief, Lawson argues that:

1. Trial counsel was ineffective for
   a. asking the jury in closing argument to find Anthony Wiggins credible;
   b. failing to investigate the victims;
   c. failing to file a motion to suppress based on police misconduct; and
   d. the cumulative effect of these errors;

2. Appellate counsel was ineffective for raising an incorrect argument;

3. The trial court committed misconduct by permitting the Blake assault charge to go to the jury;

4. The prosecutor committed misconduct by
   a. failing to bring April Blake to trial; and
   b. withholding exculpatory evidence; and

5. The evidence was insufficient to sustain the second-degree assault conviction.

ECI No. 1.

**Threshold Issues**

<u>Exhaustion of State Remedies</u>

Under *Rose v. Lundy*, 455 U.S. 509 (1982), petitioners for federal habeas corpus relief must exhaust each claim in state court. Exhaustion is achieved by seeking review of the claim in the highest available state court. *See* 28 U.S.C. §§ 2254(b)-(c); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996). In Maryland, this may be accomplished by proceeding with certain claims on direct appeal and with other claims by way of a post-conviction petition, followed by petitioning the Court of Special Appeals for

leave to appeal. Lawson no longer has any available state direct review or collateral review remedies available for the claims raised here. His claims will be considered exhausted for this federal habeas corpus review.

## Timeliness

Respondents do not contend - and the record does not show - that Lawson's petition is time-barred.

## Cognizability

Lawson argues as part of his first ground for relief that cumulative error on the part of trial counsel mandates relief. Respondents contend the claim is not cognizable in a federal habeas corpus proceeding.

Pursuant to the cumulative error doctrine, "[t]he cumulative effect of two or more individually harmless error has the potential to prejudice a defendant to the same extent as a single reversible error." *U.S. v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990), cited with approval in *US v. Martinez*, 277 F.3d 517, 532 (4th Cir. 2002); *see also United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009). Generally, however, if a court "determine[s] ... that none of [a defendant's] claims warrant reversal individually," it will "decline to employ the unusual remedy of reversing for cumulative error." *U.S. v. Fields*, 483 F.3d 313 (8th Cir. 2007). To satisfy this requirement, such errors must "so fatally infect the trial that they violated the trial's fundamental fairness." *U.S. v. Bell*, 367 F.3d 452, 471 (5th Cir. 2004). When "none of [the] individual rulings work[s] any cognizable harm,....[i]t necessarily follows that the cumulative error doctrine finds no foothold." *Sampson*, 486 F.3d 13, 51 (1st Cir. 2007). In this Circuit, however, the cumulative error doctrine is not generally recognized. *See Higgs v. U.S.,* 711 F.Supp.2d 478, 552 (D. Md. 2010) (in context of collateral relief cumulative relief available only where individual

constitutional errors found); *Arnold v. Evett*, 113 F.3d 1352, 1364 (4th Cir. 1997). For reasons noted herein, Lawson is not entitled to relief under the cumulative error doctrine.

### Standard of Review

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits:

1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision is "contrary to" Supreme Court precedent if "the state court applies a rule that contradicts the governing law set forth in our cases." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *Renico v. Lett*, ___ U.S. ___, 130 S.Ct. 1855, 1862 (2010).[5]   Section 2254(d) also requires federal courts to give great deference to a state court's factual findings.  *See Lenz v. Washington,* 444 F. 3d 295, 299 (4th Cir. 2006).   Section 2254(e)(1) of the habeas statute provides that a determination of a factual issue made by a state court shall be presumed to be correct absent clear and convincing evidence to the contrary.   The applicant has the burden of rebutting the presumption of correctness.  A decision adjudicated on the merits in a state court

---

[5]      Although § 2254(d) is a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333,  n.7 (1997), "which demands that state court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curium*), a state court decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 at 412-413.  A state court decision is based on an "unreasonable application" of clearly established federal law when "the state court  identifies the correct  governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409-410; *see also Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003); *Booth-el v. Nuth*, 288 F.3d 571, 575 (4th Cir. 2002).

and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Using this analysis, the Court now examines Lawson's remaining claims.

Ineffective Assistance of Trial and Appellate Counsel

The right to effective assistance of counsel is protected by the Sixth Amendment. Constitutional ineffective assistance of counsel claims are governed by *Strickland v. Washington,* 466 U.S. 668 (1984).[6] To prevail on a claim of ineffective assistance of counsel, a petitioner must show his attorney's performance fell below an objective standard of reasonableness and that he suffered actual prejudice. *Strickland,* 466 U.S. at 687. To demonstrate actual prejudice, a petitioner must show there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.* at 694. There exists a strong presumption that counsel's conduct was within a wide range of reasonably professional conduct, and courts must be highly deferential in  scrutinizing counsel's performance. *Id.* at 688-89. A petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101(1955)). Furthermore, a determination need not be made concerning the attorney's performance if it is clear that no prejudice would have resulted had the attorney been deficient.

---

[6]The Court reaffirmed and applied these standards in an ineffective assistance of counsel context in *Bell v. Cone*, 535 U.S.685 (2002):

> For respondent to succeed, however, he must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. [internal citation omitted]. Rather, he must show [the state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner.

*Id.* at 698-9.

*Id.* at 697. Claims alleging ineffective assistance of appellate counsel are analyzed under the *Strickland* standard. *See Smith v. Robins*, 528 U.S. 259, 285 (2000). Using this standard, the Court reviews Lawson's ineffective assistance claims.

Lawson first contends that trial counsel erred in urging the jury in closing argument "to believe Anthony Wiggins['] testimony." ECF No. 1 at 11. Prejudice is alleged because Anthony Wiggins testified that he saw Lawson strike April Blake. *Id.*

This claim was examined by the post-conviction court, which found as follows:

> Petitioner asserts … that trial counsel, in closing argument, told the jury to believe Anthony Wiggins's statement that he observed Petitioner pushing April Blake around and that this was prejudicial because it was the only charge that remained involving April Blake. Furthermore Petitioner asserts that trial counsel essentially asked the jury to find that second-degree assault, in the form of battery, did occur.

> The trial transcript of trial counsel's closing argument states as follows:

> Now, Anthony Wiggins is asked about what did he see, what actually did he see, and you all saw, he's a, he's a, he's a young kid. I'm certain that he's concerned about his mother. Uh, he's probably having a hard time talking in public. I mean, who wouldn't. And, he's certainly a young, a young kid, but what does he say that's important for your consideration. He says that he did see Mr. Lawson pushing April Blake. Pushing around, no punching, no slapping, pushing her around. What is pushing around? Is that an assault? What caused that to happen?

> Nobody says that he saw the pushing begin, he just says that he saw it happening. Sometimes two people can sort of have a mutual, two people can start a fight. If you're not certain that Mr. Lawson started anything, then he didn't assault April Blake. So, so, consider that.

> Consider that there is, he doesn't observe any injury on, on, uh, on April Blake. And, again, consider the fact that April Blake isn't here to say, uh, . . . cause, of course, they say later on they see her in her neck brace. She's not here to say anything, any treatment she received for anything later on was connected to what happened here. They're ask, they're asking you to guess that. You know, it's thrown out, that bit of information is sort of gratuitous, when the officer says,

"I saw her later on at the hospital in a neck brace." Asking you, without saying this, to conclude that that's as a result of what happened a couple hours earlier. It may, it may be totally unrelated. You'll, you'll never know, cause you've never heard her say, "I had to go to the doctor because of Mr. Lawson." She doesn't say that. She's not here to say that. And, again, no one is asking you to guess about what happened, they're asking you whether you're certain you know.

Lastly, keep, keep in mind, as far as another thing Anthony Wiggins didn't say. Remember Kisha Wiggins is saying that, that Mr. Lawson threatened her with a gun earlier. That's what he said, or that's what she said. Now, presumably, if he had gone over to this house because he wants to settle the score, or something, if that's, if that's what she wants you to believe, presumably he'd still have that. And, yet, Anthony Wiggins is asked directly, "Did you see anything in his hands?" and the answer is, "No."

Why, you know, if that was true originally, why wouldn't it be true later on? Why, you know, why wouldn't he still have that? Why wouldn't he have used it? A logical answer is because Mr. Lawson never had a gun, that's probably good reason. Uh, certainly it's, it's as likely as not likely. Uh, and, again, bear in mind, he's not seen down there.

Now, I just want to point out something to you that, that was actually a difference in testimony between, uh, Kisha Wiggins and Anthony Wiggins. Kisha Wiggins told the police that all of her kids were upstairs, then, maybe, she thinks one of her children was downstairs. Anthony Wiggins says "I was asleep downstairs." To the extent there's some conflict about that, keep that in mind. Maybe a lot of months have gone by, maybe, Anthony Wiggins, maybe, he was asleep upstairs and came downstairs. Maybe, there's even a greater delay in time. Who knows.

Trial Transcript at 1-207-09.

An attorney is not required to raise all possible defenses, but is permitted to make tactical decisions as to which defenses to pursue and which to abandon. *State v. Matthews*, 58 Md. App. 243, 245, 472 A.2d 1044, 1044 (1984). Furthermore, a valid trial tactic is to admit guilt to a lesser offense in order to avoid conviction upon a more serious offense. *Purvey*, 129 Md. App. 1, 20-23, 740 A.2d 54, 64-66, *cert. denied* 369 Md. 573 (1999).

Petitioner faced 14 charges at the start of trial. Trial counsel testified at the post conviction hearing that his trial strategy was to minimize the consequences to Petitioner because Petitioner never contended that he was not present. Trial counsel further testified that Petitioner told him that the State could not prove it and that Petitioner did not do everything the State said he did. By the time of closing arguments, trial counsel had

already successfully advocated to have eight (8) of the charges dropped. Trial Transcript at 1-182. Petitioner was left facing the following six (6) charges: first degree burglary, second degree assault upon Kisha Wiggins, second degree assault upon April Blake, third degree burglary, unlawful wearing/carrying/transporting a handgun, and fourth degree burglary. Record at 160-62.

Trial counsel testified he focused in his closing argument on minimizing what really happened by questioning all the events. While Petitioner is correct that the only charge involving April Blake was the second degree assault, Petitioner faced five (5) other serious charges. Trial counsel testified he did not want to completely discredit Anthony Wiggins because some of Anthony Wiggin's other testimony was helpful. The transcript reflects that if the jury found Anthony Wiggins credible, (and maybe find Kisha Wiggins incredible which was the defense's theory from the start), then the jury would have before it Anthony Wiggin's testimony which reflected he did not see Petitioner "break and enter" the residence, did not see Petitioner assault Kisha Wiggins, did not see a handgun and maybe did not witness an "assault" upon April Blake. As trial counsel stated to the jury, "pushing", "Is that an assault?"

The jury instruction advised assault, defined as a battery, is an offensive physical contact which was the result of an intentional, reckless or non-accidental contact, unconsented to by the victim. Record at 154. Trial counsel focused on creating reasonable doubt that an "assault," whether committed as an intent to frighten or a battery, upon April Blake occurred by telling the jury that April Blake was not present to corroborate if Petitioner assaulted her. Trial counsel also argued at trial that April Blake could have injured herself in another way leading to her injuries at the hospital. Finally, trial counsel argued that if the jury could not determine who started the altercation, if it was even an "altercation," they could not convict Petitioner of assault.

Casting aspersions on reasonable doubt as to all the charged offenses, or at most five of six, leaving the jury with perhaps one count of second degree assault upon April Blake, was trial counsel's chosen trial tactic. While Petitioner certainly could have hoped to argue a defense theory that all the State's witnesses were unbelievable, trial counsel did not take this less plausible approach. Because trial counsel made reasonable tactical decisions about which defenses to pursue and which to abandon, trial counsel's performance was not deficient arid Contention 5 is hereby denied.

ECF No.. 12, Exhibit 14 at 28-31. The record supports this finding; Anthony Wiggins's testimony could support a finding of guilt on the Blake assault charge, but actually served to lessen the level of seriousness of the altercation, especially in light of Blake's failure to appear at trial. Anthony Wiggins neither observed a gun nor saw the commission of a burglary, and these facts undermined the remaining charges. Indeed, the jury returned acquittals on the first-degree

burglary of the Wiggins residence, the second-degree assault of Kisha Wiggins, and transportation of a handgun. ECF No. 12, Exhibit 4 at 215-17. The post-conviction court's finding that trial counsel's treatment of Anthony Wiggins's testimony was a strategic choice is supported by the record and reasonably applied the *Strickland* standard. Relief is denied pursuant to 28 U.S.C. § 2254(d).

Lawson next claims that trial counsel failed to investigate the alleged victims, especially April Blake. ECF No. 1 at 12-13. Although not crystal clear, it appears Lawson believes that had counsel discovered that she told medical providers that her boyfriend, who was not Lawson, assaulted her, counsel could have sought "a dismissal or suppression of the Blake assault." ECF No. 1 at 13. This claim was reviewed at the post-conviction hearing and rejected for the following reasons:

> Petitioner asserts…that trial counsel failed to investigate all victims prior to trial, but only focuses upon April Blake in his Petition. Petition for Post Conviction Relief at p. 6. Petitioner alleges April Blake should have been more fully investigated because the statement in April Blake's medical report that her boyfriend pushed her down should have put trial counsel on notice that someone other than Petitioner may have assaulted April Blake. Petitioner believes trial counsel was so confused that trial counsel believed it was Angel Wiggins, not April Blake, who had made the statement to medical providers. Memorandum of Law at p. 10. Then, asserts Petitioner, as a result of a "proper investigation" of April Blake, trial counsel would have had information (*i.e.*, "new" information not known to all until after trial) with which trial counsel should have filed a motion to suppress charges or dismiss charges against April Blake.

> Trial counsel testified at the post conviction hearing that he met with Petitioner, gave him copies of discovery and discussed strategy. A suppression hearing was held and Petitioner did not prevail. As for April Blake, trial counsel testified he believed the State was serving her with a subpoena to appear at trial. Trial counsel further stated he did not believe that April Blake was necessary for trial because Petitioner was not denying everything and there was more than one witness to the assault upon April Blake. Trial counsel testified Petitioner told him that he was messing around with all the women in his life, there was a lot of jealousy, and in reviewing April Blake's medical records, trial counsel believed the reference to "my boyfriend" was a reference to Petitioner. Not until after the trial did April Blake

make an appearance and contact trial counsel with her February 8, 2005 post trial affidavit in which April Blake makes this "new" statement that it was not Petitioner who assaulted her, but that she would like to find the one who did. *See* Sentencing Transcript at 2-227.

Trial counsel testified at the post conviction hearing that he asked Petitioner where April Blake was. Petitioner knew April Blake through a mutual friend and Petitioner could have attempted, as the State did, to use his contacts to locate April Blake for trial to prove his innocence of the assault charge. There is no evidence Petitioner searched for April Blake. Furthermore, Petitioner did not give his trial counsel any reason to believe trial counsel should search for April Blake.

Trial counsel's performance in a claim of ineffective assistance of counsel is to be judged by the facts known at the time of trial. *State v. Thomas*, 325 Md. 160, 173, 599 A.2d 1171, 1177 (1992). "[A] decision as to the requisite degree of investigation trial counsel is expected to exert is a matter left within trial counsel's professional judgment and measured for reasonableness." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066; *Harris v. State*, 303 Md. 685, 718, 496 A.2d 1074, 1090 (1985). Furthermore, trial counsel need not pursue motions that have no merit. *Harris*, at 718, 492 A.2d at 1086; *Purvey*, 129 Md. at 17, 740 A.2d at 63, *cert. denied* 369 Md. 573 (1999).

There were simply insufficient facts known to trial counsel at the time of trial to support that trial counsel would want to, could, or reasonably should, further investigate April Blake or should move to suppress or dismiss the charge of assault upon April Blake. No facts existed to support that April Blake was claiming Petitioner's innocence until after trial. Anthony Wiggins was not proclaiming Petitioner's innocence. Also, Petitioner was not denying everything. There is no evidence to support that either the State or trial counsel knew where April Blake was. There are no facts to support Petitioner even endeavored to find April Blake for trial. As the Court of Special Appeals held upon direct appeal of this case, there was sufficient evidence, notwithstanding April Blake's unavailability at trial, to support the charge of second degree assault upon her person. *See Parker v. State*, No. 2842, slip op. at 18, 22 (Md.Ct. Spec. App. Aug. 1, 2006).

The evidence supports trial counsel reasonably investigated April Blake, based upon the facts known to trial counsel at the time of trial. Trial counsel need not pursue motions that have no merit. *Harris*, 303 Md. at 718; 496 A.2d at 1086; *Purvey*, 129 Md. at 17, 714 A.2d at 63. The evidence supports trial counsel was not amiss in declining to move for suppression or ask for a dismissal of the second degree assault charge based upon the information known to trial counsel at that time. For the above reasons, trial counsel's performance as alleged in Contention 7 was not deficient and

Contention 7 is hereby denied.

ECF No. 12, Exhibit 14 at 31-33.

The post-conviction court's conclusion does not run afoul of *Strickland.* To the extent Lawson also contends that a more thorough investigation would have uncovered that the prosecutor did not intend to call Blake as a witness and that she would have testified favorably for the defense if called, ECF No. 1 at 13, the record confirms that the prosecution tried to obtain Blake's presence at trial but Blake refused, because she feared reprisal from Lawson. ECF No. 12, Exhibit 13 at 65-69. Clearly Blake's absence from trial aided the defense by undercutting the prosecution's evidence, and keeping her medical records from the jury was consistent with this strategy. *Id.* at 76, 78, 99 and 102-03.

Blake's potentially exculpatory information surfaced after trial and after she met with Lawson at the jail. *Id.*, Exhibit 13 at 83, 87-88, 95-96. Her testimony was found not credible by the court at the hearing on Lawson's motion for new trial. ECF No. 12, Exhibit 20 at 7. This ineffective assistance claim is hereby denied pursuant to 28 U.S.C. § 2254(d).

In his final claim of ineffective assistance leveled at trial counsel, Lawson contends that counsel should have sought a suppression hearing based on police corruption, as evidenced by the inconsistency between Officer Zimmerer's police report and testimony at trial.[7] ECF No. 1 at 13-14. As noted by the post-conviction court:

> Petitioner asserts … that trial counsel was ineffective because trial counsel knew "before trial of police corruption, concerning perjury, obstruction of justice and tampering with evidence and did not file a motion to suppress such evidence before trial." Furthermore, Petitioner asserts he has documented proof Petitioner wrote to the Public Defender's Office expressing these concerns and trying to get trial counsel to file a motion to dismiss on this basis, which was disregarded by trial counsel. Petitioner asserts that Officer Zimmerer committed perjury in his statement of probable

---

[7] That testimony is found at ECF No. 12, Exhibit 4 at 121-137. Discrepancies in testimony between Zimmerer and Officer Charles Coy (*id.*, Exhibit A at 96-109) were minimal and immaterial.

cause because the statement did not match what Kisha Wiggins and Officer Coy had said in their testimony at trial.

Trial counsel testified at the post conviction that he would not characterize the issue as police corruption. Trial counsel stated he made sure the conflicts in testimony were brought out at trial, but recognized that people see different things and have different memories. Again, as already stated herein at Contention 7, trial counsel did not need to pursue motions that had no merit. Petitioner has failed to establish the allegation that trial counsel "knew of police corruption" and consequently this allegation is nothing more than a bald allegation. *See Duffy v. Warden*, 234 Md. 646, 648, 200 A.2d 78, 80 (1964); *Tucker v. Warden*, 243 Md. 331,333, 220 A.2d 908, 909 (1966). Contention 8 is hereby denied.

ECF No. 12, Exhibit 14 at 33-34. This finding is supported by the record and relief shall be denied.

Lawson's ineffective assistance claim against appellate counsel fares no better. In making his claim that appellate counsel was ineffective, Lawson complains that counsel initially raised the argument concerning the restriction of cross-examination naming the wrong witness, and also failed to include April Blake's affidavit proclaiming Lawson's innocence in support of the argument concerning sufficiency of the evidence. As iterated by the post-conviction court:

Contentions 16 and 17 also allege ineffective assistance of counsel, but Petitioner brings these allegations against appellate counsel, Ms. Nancy S. Forster. First, appellate counsel raised the wrong argument upon appeal because she argued that the cross-examination of Kisha Wiggins (should have been Officer Zimmerer) was improperly restricted, and second, appellate counsel failed to include April Blake's affidavit of Petitioner's innocence in appellate counsel's sufficiency of the evidence argument.

In selecting her issues for appeal, appellate counsel admitted in a letter to Petitioner that she had mistakenly left the argument about the issue of "cross-examination of the State's witness, Kisha Wiggins" which was raised in the first draft of her brief, in the brief that was filed with the Court. Appellate counsel explained in her letter that she had filed a motion to withdraw this issue in the Court of Special Appeals. Petitioner's Post Conviction Hearing Exhibits 1 & 2. The law does not require perfection, some missteps are allowed. *Carter*, 73 Md. App. at 440, 534 A.2d at 1016. The Court of Special Appeals did not hear the improper argument. However, the Court of Special Appeals did not hear the allegedly proper argument,

according to Petitioner, *i.e.*, whether the trial judge allegedly improperly restricted the cross examination of Officer Zimmerer. This is the argument Petitioner states should have been raised by appellate counsel.

"The Sixth Amendment does not require appellate counsel to raise every possible issue on appeal." *Gross v. State*, 317 Md. 334, 350, 809 A.2d 627, 636 (2002); *Carter v. State*, 73 Md.App. 437, 440-41, 534 A.2d 1015, 1015-16 (1988). Additionally, appellate counsel is not required to raise novel issues for which no legal authority exists, or to raise issues he has reason to believe will be rejected by the appellate court. *Id.* at 440-41, 534 A.2d at 1016.

Since failing to raise a particular appellate argument does not constitute ineffective assistance if counsel had a reasonable basis for believing the argument would fail, this Court must consider whether appellate counsel had a reasonable basis to believe that she would not likely succeed on an argument that the trial court erred in restricting cross-examination of Officer Zimmerer as to whether he accurately wrote down what Officer Coy told him. This issue was raised and reviewed above in Contention 13 with this Court finding there was no improper restriction of the cross-examination of Officer Zimmerer as alleged by Petitioner. Appellate counsel would have had a reasonable basis for believing she would not likely succeed on this argument. Therefore, appellate counsel's failure to raise this argument on appeal does not constitute ineffective assistance of counsel and Contention 16 is hereby denied.

ECF No. 12, Exhibit 14 at 37-39.

The undersigned notes that Lawson did not call appellate counsel to testify at his post-conviction hearing; accordingly, there is no evidence to rebut the presumption that counsel opted to pursue the claims she found most persuasive. Furthermore, the post-conviction court held that the trial court properly controlled the examination of Officer Zimmerer, a finding that undercuts Lawson's claim that appellate counsel was deficient for failing to raise this argument as a viable claim. The post-conviction court's decision relied on reasonable application of Supreme Court precedent. Lawson has failed to establish a basis for relief under 28 U.S.C. § 2254(d).

<u>Trial Court Error</u>

Lawson argues the trial court improperly submitted the Blake assault charge to the jury based on Blake's failure to testify at trial. ECF No. 1 at 16-17. The state post-

conviction court rejected this claim:

Contention 14 is that the trial judge improperly permitted the charge of assault on April Blake to go before the jury because April Blake was unavailable at trial to testify and because earlier the trial judge "originally dropped assault charges of April Blake because she was not in court." Petition for Post Conviction Relief at p. 8.

In preparing for the jury instructions, the trial judge stated: "What you're going to hear is that, initially, there were two alleged victims in this case, Ms. Wiggins and Ms. Blake. However, Ms. Blake did not testify, so, therefore, any charges against Ms. Blake I had to dismiss. So, primarily, the charges that remain, concerning, are charges as to the victim Kisha Wiggins who testified." Trial Transcript at 1-177.

However, upon advising the jury of the jury instructions and specifically the elements of second degree assault, the trial judge then stated:

Now we're reduced to the second-degree assaults. There are two second degree assault charges, each against, one against Ms. Wiggins, and one against April, April Blake, who did not testify.

Alright, first of all, here we go. Second-degree assault.

The second degree assault is intentionally frightening another person with the threat of immediate offense physical contact. In order to convict the defendant of assault, the State must prove:
(1) that the defendant committed an act with the intent to place Kisha Wiggins in fear of immediate offense physical contact; and,
(2) that the defendant had the apparent ability at that time to bring about offensive physical contact; and
(3) that the victim, Kisha Wiggins, reasonably feared immediate offensive physical contact; and, finally,
(4) that the defendant's actions were not legally justified.

Alright, now we not only have the intent to frighten, but we, also, have evidence of actual touching.

Second-degree assault is also causing offensive physical contact to another person. In order to convict the defendant of assault, in other works, offensive physical contact:
(1) that the defendant caused the offensive physical

contact with Ms. Wiggins;
(2) that the contact was the result of an intention or
reckless act of the defendant, and was not accidental;
(3) that the contact was not consented to by Ms., Ms.
Wiggins, or legally justified.

        Any additions, corrections, additional instructions, if so,
please approach.

    MS. PAULER: No, your Honor.

    MR. REED: Uh, I don't believe so at this time, your Honor.

Trial Transcript at 1-190-192.

    The verdict sheet given to the jury included, at (3), the second-degree
assault upon Ms. Wiggins, and, at (4), the second-degree assault on April. *Id.*
at 1-192. Petitioner failed to object to the jury instructions given by the trial
judge, which included the second-degree assault upon April Blake. Failure to
object or otherwise challenge an allegedly deficient jury instruction, constitutes
a waiver of this matter for purposes of post conviction. Md. Crim. Proc.
§7106(b)(2001 & Supp. 2007); *State v. Rose*, 345 Md. 238, 245-45, 691 A.2d
1314, 1317-18 (1997); *Walker v. State*, 343 Md. 629, 649, 684 A.2d 429, 439
(1996); *State v. Tichnell*, 306 Md. 428, 464, 509 A.2d 1179, 1197 (1986).
Contention 14 is hereby denied. Furthermore, it is clear that a review of the
transcript discloses only that the trial judge misspoke when he indicated the
charge against April Blake was dismissed. The record discloses that the
Motion for Judgment of Acquittal as to the second degree assault of April
Blake was denied.

ECF No. 12, Exhibit 14 at 24-25.

    Under Maryland law, where the evidence supported the charge that Lawson assaulted

April Blake, the trial court was required to send the charge to the jury.[8]  The trial court initially

misspoke, then corrected his instructions to the jury.  No ground for relief exists 28 U.S.C.

§ 2254(d).

Prosecutorial Misconduct

    Lawson next claims that the prosecutor committed misconduct by failing to present April

---

[8] *See, e.g., Brooks v. State*, 299 Md. 146, 150-51 (1984); *Vuitch v. State,* 10 Md. App. 389, 396-97 (1970), *cert.
denied*, 261 Md. 729.

Blake's testimony at trial and by withholding her true whereabouts from the defense. ECF No. 1 at 10-11 and 14-16. The post-conviction court rejected these claims as follows:

> At the post conviction hearing, the prosecutor testified that the State's Attorney's Office did not know April Blake's exact location but only had her cell phone number. The prosecutor's office discovered that Ms. Blake might have been staying at a housing development in Martinsburg, West Virginia. However, the prosecutor had no further ability to compel Ms. Blake's attendance at trial.

> Furthermore, the prosecutor testified at the sentencing and post conviction hearing that she did not know April Blake had asserted Petitioner was innocent.

> Petitioner has failed to prove facts to establish the allegation that the prosecution violated Petitioner's right to confrontation by its failure to compel April Blake's attendance at trial. Because the State had no means to compel April Blake's attendance, April Blake's "testimony"' was not used against Petitioner and Petitioner's right to confrontation was not violated. The testimony of eyewitness Anthony Wiggins accused Petitioner of assault upon April Blake, and Anthony Wiggins was available and subject to cross-examination by the Defense.

> In contrast to the State's actions, Petitioner did not attempt to locate and subpoena April Blake. Trial counsel testified at the post conviction hearing that he did not expect April Blake to appear for trial and did not think April Blake was necessary for trial. Trial counsel testified he did ask Petitioner about April Blake. However, trial counsel believed that April Blake's testimony was of less import because Petitioner was not denying everything that had occurred, there was already another witness to the events, and he had no knowledge at the time of the trial that April Blake would later assert that Petitioner was innocent.

> Because April Blake was not available at trial, her medical records were hearsay and properly inadmissible. Trial counsel testified he had a conversation with Petitioner in which Petitioner admitted messing around with all the women in his life and that there was a lot of jealousy. As for April Blake's statement in her medical records that "[h]er boyfriend pushed her to the ground and hit her with his fist" (Transcript at 1-42), trial counsel thought this was a reference to Petitioner, even though trial counsel and Petitioner never had a conversation about any relationship between Petitioner and April Blake. Trial counsel testified he had April Blake's medical records prior to trial but, as a matter of trial strategy, he believed they would be more hurtful than helpful at trial.

> Contention 24 is basically a reiteration of the *Brady* violation raised in Petitioner's Contention 3 and both Contentions, 3 and 24, will be discussed

herein.

The seminal case regarding the State's duty to disclose information to the defense is *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963). In order to establish a *Brady* violation, Petitioner must establish that the prosecutor suppressed or withheld evidence that (1) is favorable to the defense, either because it is exculpatory, provides a basis for mitigation of sentence, or because it provides grounds for impeaching a witness, and (2) is material. The State's duty to disclose exculpatory evidence as enunciated in *Brady* is to ensure defendant receives a fair trial. *Id.* at 87, 83 S.Ct. at 1197.

The United States Supreme Court in *United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375, 3380 (1985) stated that "[t]he *Brady* rule is based on the requirement of due process... [T]he prosecutor is . . . to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial . . .". Evidence is suppressed under *Brady* if it is "information which had been known to the prosecution but unknown to the defense." *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 557 (4th Cir. 1999).

As stated above, the prosecutor testified she did not know April Blake's location and that Ms. Blake did not tell the State that Petitioner was innocent. There is no evidence that the prosecutor had knowledge before, during, or after trial of Ms. Blake's location or of any claim by Ms. Blake that Petitioner was innocent. As for April Blake's medical records, Petitioner was given these records during discovery.

Because the State did not have information known to it, but not to the defense, to include April Blake's location, post trial claim of innocence, or statement in her medical records, the State was under no obligation to disclose the alleged information to Petitioner.

ECF No. 14, Exhibit 14 at 14-16.

The record confirms that the prosecution believed Blake would testify at trial that Lawson had assaulted her. The prosecution was unable to produce Blake at trial because it did not know her exact whereabouts. *Id.*, Exhibit 13 at 65-67. As noted herein, based on the information known at the time of trial, Blake's absence favored the defense, and the defense did not intend on obtaining her presence at trial. The post-conviction court's finding that there was no prosecutorial misconduct as alleged is a reasonable application of Supreme Court law, and survives scrutiny under 28 U.S.C. § 2254(d).

<u>Sufficiency of the Evidence</u>

In assessing sufficiency of the evidence to support a criminal conviction, the district court must examine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318 (1979). It does not matter whether the district judge believes the evidence established guilt beyond a reasonable doubt; instead, the relevant question "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id* at 318-319; *see also Wright v. West*, 505 U.S. 277, 296-97 (1992) (reviewing court faced with record of historical facts that supports conflicting inferences must presume, even if it does not affirmatively appear in the record, that trier of fact resolved such conflicts in favor of prosecution, and must defer to that resolution).

Lawson claims the evidence was insufficient to sustain his conviction for assaulting Blake. The findings of the appellate court, which denied the claim on direct appeal, follow:

> [Lawson] next argues that there was insufficient evidence to sustain the conviction for the second degree assault of Blake. Pointing out that the trial court instructed the jury that one could commit a second degree assault by either intentionally frightening a person **or** by committing a battery on a person, [Lawson] claims that "given that the jury was not instructed to specify which theory of assault it found Mr. [Lawson] guilty of with respect to Ms. Blake, it is impossible to know" of which variety of assault the jury found him guilty. He asserts that there was not sufficient evidence of the intent-to-frighten variety because Blake never testified, and thus, there was no evidence that she was in fact frightened.[13] Because the jury may have based its guilty verdict on the intentional frightening variety of assault when, in fact, the evidence was insufficient to establish that variety[,]" he claims, his "conviction must be overturned and retrial barred."
>
> * * *
>
> Assault is a statutory crime in Maryland, defined as "the crimes of assault, battery, and assault and battery, which retain their judicially determined meanings." Md. Code, Crim. Law § 3201(b)(2002, 2005 Cum. Supp.)(definition); § 3-203 (prohibition). The Maryland Pattern Jury Instructions provide instructions on three forms of the offense: the "intent to frighten" variety, attempted battery, and actual battery. *See* MPJI-Criminal

4:01 (2005). The Pattern Jury Instructions given on second degree assault in [Lawson]'s trial were version "A - Intent to Frighten," and version "C - Battery." The "Notes on Use" to these instructions state that "it is unlikely that both . . . version 'A' and version 'C' are applicable." Yet [Lawson] cites no support, nor are we aware of any, that it is error for a court to instruct the jury as to both forms of the offense. Nor do we believe that it was error.

[Lawson] correctly argues that, to commit an assault of the intentional frightening variety, "[a]ll that is required in terms of perception is an apparent present ability from the viewpoint of the threatened victim." *Lamb v. State*, 93 Md. App. 422, 443 (1992), *cert. denied*, 329 Md. 110 (1993)(emphasis added). If the victim of the threat "is unaware of the threatening conduct, there can be no assault of this variety." *Id.* From these statements of the law, [Lawson] claims that the victim's *own testimony* that he or she was frightened is necessary to prove the intent to frighten variety of second degree assault.

In making this argument, [Lawson] relies on *Harrod v. State*, 65 Md. App 128 (1985). This reliance, however, is misplaced. In *Harrod*, we did not determine that testimony from the alleged victim was needed to establish that the victim was frightened. We merely decided that the evidence was insufficient to prove that the victim, a child asleep in his crib, was frightened because the child was unaware that the defendant had thrown a weapon in the room where he lay sleeping. *See id.* at 138.

What [Lawson] fails to realize is, although it is the "viewpoint of the threatened victim" that is critical, circumstantial evidence can be used to prove that viewpoint. *See Fetrow v. State*, 156 Md. App. 675, 691, *cert. denied*, 382 Md. 347 (2004) (circumstantial evidence can be used to prove intent to frighten in a robbery case). The circumstantial evidence elicited at [Lawson]'s trial was sufficient for a rational juror to have believed that he committed the intentional frightening variety of assault. The State established that, upon hearing a loud bang and glass breaking at the back door, Blake went to investigate. Anthony testified that he saw [Lawson] in the kitchen hitting and pushing Blake while Blake screamed and cried. Officer Zimmer similarly testified that, when Blake exited the house to speak with him, she was still crying and upset. A rational juror could believe that [Lawson] had frightened Blake, satisfying the requirements for the intent to frighten variety of second degree assault.

In deciding that there was sufficient evidence of the intent to frighten form of second degree assault, we are not holding that the evidence must be sufficient to establish every form of second degree assault on which the jury is instructed. While not entirely on point, the Court of Appeals' decision in *Rice v. State*, 311 Md. 116 (1987), is helpful. There, the appellant argued that the jury should have been instructed that, in order to find him guilty of theft, it had to be unanimous as to which variety of theft he was guilty. The Court

of Appeals found no error in the denial of this instruction, reasoning that, because the different varieties of the crime were "not autonomous offenses but rather one crime defined two ways[,] . . . jury unanimity . . . is not constitutionally required." *Id.* at 136. The evidence in [Lawson]'s case was sufficient to support both the actual battery form (indeed, [Lawson] does not dispute this) and intent to frighten form of second degree assault. It is not required that the jury specify which.14

_____

13 [Lawson] does not dispute that there was sufficient evidence of the battery variety.

14 We also observe that [Lawson] could have requested a special verdict sheet asking the jury to set forth written findings on the elements of the crime they found.

ECI No. 12, Exhibit 8 at 18-22.

The evidence presented at trial supported two varieties of second-degree assault; battery and intent to frighten. The state appellate court's analysis is reasonable under *Jackson* and must be upheld under 28 U.S.C. § 2254(d).

**Certificate of Appealability**

A habeas petitioner has no absolute entitlement to appeal a district court's denial of his motion. *See* 28 U.S.C. § 2253(c) (1). "A [Certificate of Appealability, or "COA"] may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at §2253(c) (2). The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke,* 542 U.S. 274, 282, (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484, (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,' " *Miller-El v. Cockrell*, 537 U.S. 322, 335-36, (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)).

The Court will not issue a certificate of appealability because Lawson has not made the requisite showing. Denial of a certificate of appealability in this Court does not prevent Lawson from seeking a certificate of appealability from the appellate court.

The Petition is denied and dismissed.  A separate order follows.

_____/s/_____

PETER J. MESSITTE

UNITED STATES DISTRICT JUDGE

March 25, 2011